# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT WINCHESTER

| | |
|---|---|
| KWAKU AYREL OKRAKU, | ) |
| *Petitioner*, | ) Case No. 4:18-cv-22 |
| | ) |
| v. | ) Judge Travis R. McDonough |
| | ) |
| ARVIL CHAPMAN, Warden, | ) Magistrate Judge Susan K. Lee |
| | ) |
| *Respondent*. | ) |

## MEMORANDUM OPINION

Petitioner Kwaku Ayrel Okraku, a Tennessee inmate proceeding *pro se* on a federal habeas petition filed pursuant to 28 U.S.C. § 2254, challenges the legality of his confinement under judgments of convictions from the Davidson County Criminal Court for two counts of aggravated child neglect and one count of reckless homicide, for which he is serving an effective 60-year sentence. Having considered the submissions of the parties, the State-court record, and the law applicable to Okraku's claims, the Court finds that the petition should be denied.

**I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On June 11, 2008, Okraku was living with his girlfriend, LaTonya Majors, and her three-year-old daughter in a townhouse in Antioch, Tennessee. *State v. Okraku* (*Okraku I*), No. M2013-01379-CCA-R3-CD, 2014 WL 3805801, at *1 (Tenn. Crim. App. Aug. 1, 2014). That evening, the child and Majors arrived home shortly before Okraku, who then left again. *Id*. at *2. The child began playing unattended in the house. *Id*.

Approximately forty-five minutes to an hour later, while Majors was on the phone, the child began holding her hands together as if praying and talking about Jesus. *Id*. She also began

to name everyone she knew and ignored her mother's attempts to speak to her, all of which was very unusual behavior. *Id*. Majors recorded a video of the child on her cell phone. *Id*.

A few minutes later, Okraku returned to the home, and Majors played the video for him. *Id*. The child collapsed suddenly in Okraku's arms; she was limp, and her eyes were rolling. *Id*. at *3. Majors took the child outside and began screaming for help, while Okraku called 911. *Id*. A neighbor performed CPR. *Id*.

When the paramedics arrived, the child was having a seizure. *Id*. She went into cardiac arrest *en route* to the hospital, where she was later revived. *Id*. at *3–*4. Test results showed the child had cocaine in her system. *Id*. at *4. Upon learning of the test results, Majors became visibly upset and shouted at Okraku that she hated him. *Id*. When a social worker informed Okraku of the test results and that she had notified the police and the Department of Children's Services that the child had cocaine in her system, Okraku threw up his arms and cursed. *Id*. at *5. The child eventually died of an overdose of cocaine, which a medical professional opined she ingested within an hour prior to experiencing the seizures. *Id*.

Okraku was subsequently indicted on two counts of aggravated child neglect and one count of felony murder. (Doc. 11-1, at 3–7.) Majors was named as a co-defendant, and their cases were severed. (*Id*.; *see also, e.g.*, Doc. 11-4, at 114–15.) In Okraku's first trial, the jury could not reach an unanimous verdict, and the court declared a mistrial. (Doc. 11-1, at 41; Doc. 11-6.) Okraku was retried in June of 2011. (*See, e.g.*, Doc. 11-4.)

Majors testified at the retrial that she had confronted Okraku about cocaine in December 2006 after finding the victim in Okraku's closet with a bag containing two dark yellow "rocks" in her mouth. *Okraku* I, 2014 WL 3805801, at *4. Okraku initially tried to convince Majors that the substance was rat poison, but after Majors continued to press him, he "smirked" and told her that she "knew what it was." *Id*. Okraku took the bag and left, saying that he had been keeping

it for a friend. *Id*. Majors believed the substance to be cocaine. *Id*. After the incident, Majors told Okraku that he could not possess drugs in their home, and he assured her that he would not do it again. *Id*.

Majors also testified that, the day after learning about the cocaine in the victim's system, she and Okraku discussed its origins. *Id*. Okraku stated that the victim might have gotten it from playing with one of his ball caps because he had "cooked some up" in the microwave on the night the child collapsed. *Id*. Majors understood him to mean cocaine from the context of the conversation. *Id*. Okraku showed Majors the hat, and she saw white powder on it. *Id*. at *5. Okraku admitted to Majors that he was "back at it," which she understood to mean that he was selling drugs again. *Id*. Majors described Okraku's tone as sarcastic, but she believed that he was admitting what had happened. *Id*.

Majors testified that the victim had been with her all day prior to the incident and that the victim could have only ingested the drug during the hour or so that she was playing in the home right before she began acting strangely. *Id*. at *1–*2.

Robert Cross, an inmate who had been confined with Okraku, testified that Okraku had solicited legal advice from him after being arrested. *Id*. at *6. During their conversations, Cross maintained, Okraku admitted that on the day of the victim's death, he had been bagging up cocaine for resale, and that he left the table where he was working to go the restroom. *Id*. Okraku told Cross that when he returned, he saw the victim with a white substance in her hand, and she later collapsed. *Id*. Okraku also purportedly told the inmate about cooking something in the microwave. *Id*. Okraku confided to Cross that he was concerned Majors would testify against him. *Id*.

Okraku testified in his own defense, stating that drugs were not in the bag involved in the December 2006 incident. *Id*. at *7. He maintained that, when he learned of the victim's positive

3

cocaine results, he cursed because he was upset and confused. *Id*. at *8. Okraku denied having any conversations with Majors about how the victim found cocaine, and he denied that he possessed or cooked drugs in the microwave on the night of the incident. *Id*. at *8–*9. Okraku admitted talking to Cross about his charges, but he claimed that Cross lied about Okraku's admissions. *Id.* at *9. He also admitted that he had never seen Majors use drugs. *Id*.

Okraku's jury convicted him on the two charged counts of aggravated child neglect and one count of reckless homicide. (Doc. 11-1, at 64–66.) The trial court imposed a total effective sentence of sixty years' imprisonment. (*Id.*) Okraku did not file a timely notice of appeal, and the Tennessee Court of Criminal Appeals ("TCCA") denied his motion to waive the timely-filing requirement. (Doc. 11-17.)

Thereafter, Okraku filed a *pro se* petition for post-conviction relief, and the post-conviction court granted him a delayed direct appeal. (Doc. 11-1, at 67–72, 89.) In that delayed direct appeal, Okraku challenged the legal sufficiency of the evidence to support the convictions and raised alleged evidentiary errors. *Okraku I*, 2014 WL 3805801, at *1. The TCCA affirmed the convictions but ordered that the judgments for aggravated child neglect be merged on remand. *Id*. at *17. On December 19, 2014, the Tennessee Supreme Court denied discretionary review. (Doc. 11-16.)

Okraku filed a second pro se petition for post-conviction relief on September 23, 2015. (Doc. 11-19, at 36–66.) With the assistance of appointed counsel, Okraku amended the petition to claim, among other things, that trial counsel rendered ineffective assistance in failing to impeach the victim's mother with a letter she wrote to Okraku prior to his second trial. (*Id*. at 77–80.) After an evidentiary hearing, the post-conviction court denied relief. (*Id*. at 85–90.)

On appeal from the post-conviction court's decision, the TCCA held that trial counsel's performance was not deficient, because he made a reasonable strategic decision not to introduce

4

the letter. *Okraku v. State* (*Okraku II*), No. M2016-02545-CCA-R3-PC, 2017 WL 4012832, at *8–*9 (Tenn. Crim. App. Sept. 12, 2017). The TCCA affirmed the denial of the petition. *Id*. at *9. The Tennessee Supreme Court denied discretionary review on January 17, 2018. (Doc. 11-34.)

On or about March 14, 2018, Okraku filed the instant federal habeas petition (Doc. 1). Respondent answered on July 16, 2018. (Doc. 12.) Okraku replied to the answer on August 8, 2018. (Doc. 13.) Thereafter, the Court ordered Okraku to submit a list of his federal habeas grounds for relief, advising him that many of his claims were improperly raised and granting him leave to amend his petition to clarify his claims. (Doc. 18.) Okraku filed an amended federal habeas petition on November 18, 2019, raising the following claims (as paraphrased by the Court):

Ground One: The evidence was insufficient to sustain the convictions.

Ground Two: The trial court improperly allowed the admission of prior bad act evidence.

Ground Three: Trial counsel rendered ineffective assistance in failing to use a pre-trial letter written by the victim's mother to Okraku to impeach her credibility.

(Doc. 22.) Respondent answered the amended petition on January 17, 2020. (Doc. 27.) Okraku sought and obtained an extension of time within which to file a reply to Respondent's answer, submitting his reply on March 9, 2020. (Doc. 30.)[1] This matter is ripe for the Court's review.

---

[1] In his reply, Okraku points the Court to arguments and claims raised in his original petition. (*See generally* Doc. 30.) The Court previously advised Okraku that he had properly raised only two claims in his original petition and that the remainder of his claims were insufficiently alleged under Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts. (Doc. 18.) In granting Okraku leave to his amend his petition to clarify his claims, the Court explicitly required Okraku to list his federal habeas claims and cautioned him against attempting to incorporate claims and arguments by reference. (*See id*. at 2.) Accordingly, the claims and arguments not contained in the amended petition and raised in Okraku's reply are not properly before the Court. *See, e.g.*, *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (holding

## II. LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in a State court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1), (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner. *See id.* at 407–08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). Whether a decision is "unreasonable" is an objective inquiry; it does not turn on whether the decision is merely incorrect. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."); *Williams*, 529 U.S. at 410–11. This standard will allow relief on a federal claim decided on its merits in State court only where the petitioner demonstrates that the State ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

---

arguments raised for first time in reply brief are waived); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (holding issues raised for first time in reply brief are waived).

When evaluating the evidence presented in State court, a federal habeas court presumes the correctness of the State-court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The doctrine of procedural default also limits federal habeas review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available State remedies, and the State court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a State court clearly and expressly bases its dismissal of a claim on a State procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 731–32, 735 n.1 (1991). A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause and actual prejudice for the default, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Id.* at 750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90–91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules, or that his trial counsel rendered ineffective assistance. *Coleman*, 501 U.S. at 753. Additionally, the prejudice demonstrated to overcome the default must be actual, not merely a possibility of prejudice. *See Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986) (citations omitted); *see also United States v. Frady*, 456 U.S. 152, 170 (1982) (holding prejudice showing requires petitioner to bear "the burden of showing, not merely that errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimension") (emphasis in original). A fundamental miscarriage of

justice of occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

### III. DISCUSSION

#### A. Sufficiency of the Evidence

In his first claim for relief, Okraku argues that the evidence against him was insufficient to sustain his convictions, as the witnesses against him — Cross and Majors — both had incentives to fabricate their testimonies. (Doc. 22, at 5.) Okraku additionally argues that there was no independent evidence demonstrating that there was even cocaine in the residence before the victim died. (*Id.*)

A challenge to the sufficiency of the evidence is governed by the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which allows a reviewing court to set aside a verdict on the basis of insufficient evidence only if, "after viewing the evidence in the light most favorable to the prosecution," no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The reviewing court must presume that the trier of fact resolved conflicting inferences of fact in favor of the prosecution and must defer to that resolution, because such a standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Because both the AEDPA and *Jackson* standards apply to insufficiency claims, this Court's review is doubly deferential. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

On direct appeal, the TCCA concluded that Okraku's convictions were supported by sufficient evidence, noting:

> Viewed in the light most favorable to the State, the evidence shows that on June 11, 2008, the defendant brought cocaine into his residence. He was preparing the cocaine for resale, and some of the cocaine came to rest on one of his baseball caps. The victim was able to access the cocaine, ingested it, and began exhibiting

strange behavior that necessitated a 911 call. The victim later passed away, and toxicity from cocaine ingestion was determined to be the cause of her death. The presence of cocaine in the victim's system was confirmed by two separate tests. Dr. Davis and Dr. Seger both testified that the victim died due to cocaine ingestion. Ms. Majors testified that the defendant told her that he had been "cooking some up" in the microwave the night of the incident and that the victim may have ingested cocaine from one of his baseball caps. Ms. Majors testified that she saw a baseball cap belonging to the victim that contained a white powder. Ms. Majors also testified to an incident that occurred in December of 2006, where she discovered the victim with a bag in her mouth that contained what Ms. Majors believed was rock cocaine. Mr. Cross testified that the defendant told him that he was bagging up cocaine for resale and that he witnessed white powder on the victim's hands.

The defendant contends that there was no proof that he brought cocaine into the residence, and he claims that the testimonies of Ms. Majors and Mr. Cross were "inconsistent at best." However, the jury chose to credit the testimonies of Ms. Majors and Mr. Cross over the testimony of the defendant. It is the jury who resolves questions of witness credibility, and this court will not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." *Bland,* 958 S.W.2d at 659. We conclude that the evidence is sufficient to support the defendant's convictions for aggravated child neglect and reckless homicide. From the proof at trial, a jury could find that the defendant brought cocaine into his residence knowing that the victim was able to access it; the victim was three years old at the time, within the age requirement enumerated by the statute; and the defendant's actions caused the victim to ingest cocaine, which resulted in her death. The evidence shows that the defendant's act of neglect resulted in serious bodily harm to the victim and that a controlled substance was used to accomplish the neglect. Accordingly, the defendant is not entitled to any relief as to this issue.

*Okraku I*, 2014 WL 3805801, at *11–*12.

In reviewing the TCCA's decision, the Court notes that Tennessee law dictates that a person commits the offense of aggravated child neglect when he or she "knowingly abuses or neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare," and "[t]he act of abuse, neglect[,] or endangerment results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-401(b); *id.* § 39-15-402(a)(1). A person also commits aggravated child neglect if a "controlled substance. . . is used to accomplish the act of abuse, neglect[,] or endangerment." *Id.* § 39-15-402(a)(2). A person commits reckless homicide by recklessly killing another. *Id.* § 39-13-215(a).

9

In this case, medical experts testified that the cocaine ingested by the three-year-old victim caused her to have seizures which resulted in brain injury and death. (Doc. 11-5, at 41–42, 153–54.) Majors testified that she did not use cocaine and did not bring cocaine into the home. (Doc. 11-4, at 78, 85.) Additionally, the evidence presented demonstrated that the victim was supervised by her mother all day until approximately one hour before the victim began displaying symptoms. (*Id*. at 52–63, 67–69.) The testimony established that Okraku later admitted that he was selling drugs again and that, on the same day as the incident giving rise to the instant charges, he "cook[ed]" and packaged cocaine in the home. (*Id*. at 91–93, 110–13.) Moreover, Majors saw one of Okraku's ball caps with white powder on it. (*Id*. at 92–93, 145–46.) She also testified that, on a previous occasion in December 2006, the victim found a bag of what Majors thought to be cocaine in Okraku's closet and put it in her mouth. (Doc. 11-4, at 79–83.) Additionally, Okraku told another inmate that he was preparing cocaine for resale and that, after leaving the cocaine unattended, he returned to find white powder on the victim's hands. (Doc. 11-5, at 3–4.)

There is no explanation in the record for how the victim was exposed to cocaine unless it came from Okraku, and the medical evidence was clear that cocaine was the cause of death. Moreover, the evidence presented established that Okraku knew from experience that keeping cocaine in the home presented a risk to the victim, as she had already once been found with packaged cocaine in her mouth. Therefore, in light of all the evidence, a rational jury could have concluded that Okraku's neglectful conduct resulted in serious bodily injury to the victim and that his reckless conduct caused the victim's death. Therefore, the state court's conclusion to that effect is not objectively unreasonable.

Additionally, to the extent that Okraku contends Majors's testimony was rendered insufficient due to inconsistencies in her testimony, the state court correctly determined that the

10

*Jackson* standard leaves credibility determinations to the trier of fact. *See Jackson*, 443 U.S. at 318–19 ("This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

In sum, the decision rejecting this claim was neither contrary to, nor an unreasonable application of, the *Jackson* standard, nor was it based upon an unreasonable determination of facts in light of the evidence presented. Okraku is not entitled to federal habeas relief as to this claim.

### B. Trial-Court Error

Okraku next claims that the trial court erred in admitting two pieces of prior-bad-act evidence: (1) evidence of the 2006 incident when the victim was found with a bag of cocaine in her mouth (Doc. 22, at 6–7), and (2) the testimony of a jailhouse informant, Robert Cross, who testified that Okraku admitted to him that he saw white powder on the victim's lips the day she died (*id*. at 8). Okraku raised both of these claims on direct appeal as alleged evidentiary errors under Tennessee Rule of Evidence 404(b), while also asserting that the admission violated his "Due Process Rights." (Doc. 11-10, at 17–20.) The TCCA addressed these claims on state-law grounds. *See Okraku I*, 2014 WL 3805801, at *12–*16.

As a preliminary matter, the Court notes that it is well-settled that a federal claim must be fairly presented to the TCCA in order to satisfy the exhaustion requirement of 28 U.S.C. § 2254(b). *See, e.g.*, *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003); *Franklin v. Rose*, 811 F.2d 322, 324–25 (6th Cir. 1987); *see also* Tenn. S. Ct. R. 39 (establishing that presentation of claim to the TCCA is sufficient to exhaust state remedies). In this case, Okraku's claims were presented in state court on the basis of state law, with only a passing reference to "due process" without supporting argument. (Doc. 11-10, at 17–20.) Accordingly, Okraku failed to properly

present and exhaust these federal claims in state court, and his federal claims are now procedurally defaulted. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) ("General allegations of the denials of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated."); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period); *id.* § 40-30-102(c) ("one petition" rule).

Moreover, state evidentiary claims are not cognizable grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus."). Therefore, Okraku's claims that state law was violated do not raise a cognizable claim.[2]

Accordingly, the Court finds that these claims are procedurally defaulted, and Okraku is not entitled to habeas relief as to these claims.[3]

### C. Ineffective Assistance of Counsel

---

[2] Even if Okraku had presented this Court with a properly exhausted federal due-process claim, the Court notes that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Therefore, Okraku cannot establish that the decision rejecting this claim was contrary to clearly established Supreme Court precedent under § 2254(d).

[3] Respondent also argues that these claims are untimely, alleging that they were raised first in the amended petition and do not relate back to the original petition. (Doc. 27, at 19–22.) *See Mayle v. Felix*, 545 U.S. 644, 664 (2005) (holding that, in order to relate back to the original petition, "the original and amended petitions [must] state claims that are tied to a common core of operative facts"); Fed. R. Civ. P. 15(c)(1)(B) (determining that claim relates back if the original and amended petition arise out of same "conduct, transaction, or occurrence"). Because these claims are without merit, the Court declines to address the claims' timeliness.

In his third and final ground for relief, Okraku claims that trial counsel rendered ineffective assistance by failing to impeach Majors at trial with a letter she wrote to Okraku while he was in jail in which she admitted that she "lied to police and misstated [Okraku]'s statements." (Doc. 22, at 10.) This claim was presented and rejected during Okraku's post-conviction proceedings. *Okraku II*, 2017 WL 4012832, at *8.

Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a habeas petitioner to satisfy a two-prong test to warrant federal habeas corpus relief: (1) he must demonstrate constitutionally deficient performance, and (2) he must demonstrate actual prejudice as a result of such ineffective assistance. *Id.* at 687. Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687–88. A reviewing court's scrutiny is to be highly deferential to counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id.* at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id.*

Prejudice is established when the petitioner can demonstrate a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Id.* at 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id.* at 691.

On habeas review, the issue for the district court is not whether the *Strickland* standard is met, but, rather, whether the state court's decision that *Strickland* was not met warrants relief under AEDPA standards. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("When 2254(d)

13

applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, when a *Strickland* claim has been rejected on its merits by a state court, a petitioner seeking federal habeas relief "must demonstrate that it was necessarily unreasonable" for the state court to rule as it did. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

The letter Majors wrote to Okraku was introduced during post-conviction proceedings, and it stated, in pertinent part:

> Over the past few weeks[,] I've been tormenting myself over this scripture which I crossed first in my sleep then again twice . . . at church and on [F]acebook. I know you've already forgiven me for this but I've never officially apologized nor asked [for] forgiveness. I'm truly sorry for lying or basically taking your words and using them for evil. I apologize for using your comment against you. I knew you weren't serious when we were arguing over where the drugs could've come from. I knew you were being sarcastic but I didn't tell them that. I only told them because I didn't want you to get away scott [sic] free if you were responsible for [the victim's] death. Please forgive me and accept my apology. I promise I will tell them how the conversation[,] well [,] argument actually went down even if it means I have to go to jail. I can't keep living with this burden[,] it's killing me.
>
> . . . After we found out that [the victim] had cocaine in her system[,] I didn't know what else to attribute it to but you. Then I learned that Neesha was dealing with that crap and it realy [sic] didn't sit too well with me that I imediately [sic] looked at you.

*Okraku II*, 2017 WL 4012832, at *4 (Tenn. Crim. App. Sept. 12, 2017) (footnote omitted) (alterations in original).

Majors testified at the post-conviction hearing that she wrote the letter to Okraku on November 30, 2010. (Doc. 11-20, at 3–4.) She explained that, after her child died, she learned that her best friend, Neesha, was also selling cocaine. (*Id*. at 5–6.) Majors testified that, when she wrote the letter, she was feeling "torn" about whether it was Okraku or her best friend that had caused the victim's death, and she did not like using Okraku's statements "against him"

14

when she "didn't have proof he was responsible." (*Id*. at 8.)  However, Majors further testified that the victim was not around Neesha on the day of the incident. (*Id*. at 6–7, 8.)

Trial counsel testified at the post-conviction hearing that Okraku's brother brought him the letter Majors wrote Okraku before the retrial. (Doc. 11-22, at 19.)  Counsel stated that he considered using the letter for impeachment purposes and discussed it with the prosecutor. (*Id*. at 20.)  The prosecutor informed trial counsel that the prosecution would introduce "jail calls" between Okraku and Majors as rebuttal evidence if the letter was used at trial. (*Id*.)  Trial counsel testified that he made a strategic decision not to use the letter after his conversation with the prosecutor, as it could have harmed the defense by opening the door to "some other issues." (*Id*. at 20–21.)  Instead, counsel testified that, during his cross-examination of Majors, he "hinted to some of the things[,] trying to get her to say some of the things without bringing up the letter." (*Id*. at 21.)

The post-conviction court credited trial counsel's testimony and denied Okraku's claim. (Doc. 11-19, at 90.)  On post-conviction appeal, the TCCA reviewed the witness testimony provided at the post-conviction hearing and concluded that trial counsel made a strategic decision not to introduce the letter as impeachment evidence at trial. *Okraku II*, 2017 WL 4012832, at *8.  Specifically, the TCCA noted that the trial court found trial counsel credible and relied on his testimony that he chose not to introduce the letter because it would open the door to additional inculpatory evidence from the prosecution and because he could elicit much of the information without the letter during cross-examination. *Id*.

The Court finds that the record supports a determination that counsel weighed the potential cost and benefit of using Majors' letter as impeachment evidence and ultimately decided against using it.  Such a choice is entitled to a presumption that counsel exercised a reasonable professional judgment. *See Strickland*, 466 U.S. at 690–91 (holding counsel's

"strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"); *Millender v. Adams*, 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002) (stating that "impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available").

Moreover, a comparison of the letter with Majors' trial testimony shows that the impeachment value of the letter was not particularly significant, as it did not directly conflict with any of her testimony at trial. (*Compare* Doc. 11-23, at 3–6, *with* Doc. 11-4, at 42–153.) In the letter she wrote to Okraku, Majors merely expressed doubt about Okraku's guilt and apologized for testifying against him. (*See* Doc. 11-23, at 3–5.) Although she claimed in the letter that she did not explain Okraku's "sarcasm" to police and mentioned learning after the victim's death that her best friend had been selling drugs, she testified at trial about both Okraku's sarcastic tone and her best friend's drug-selling activity. (Doc. 11-4, at 101–11, 128, 146, 148–49.) Therefore, counsel's decision not to introduce the letter did not prejudice Okraku.

Accordingly, the Court finds that that the rejection of this claim was not contrary to, nor did it involve an unreasonable application of, *Strickland* and its progeny, nor was it based on an unreasonable determination of facts in light of the evidence presented. Okraku is not entitled to habeas relief as to this claim.

## IV. CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any

claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.  Applying this standard, the Court concludes that a COA should be denied.

## V.     CONCLUSION

Okraku has failed to demonstrate that he is entitled to federal habeas relief.  Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.  A certificate of appealability from this decision will be **DENIED**.

Further, the Court will **CERTIFY** that any appeal from this action would not be taken in good faith.  Fed. R. App. P. 24.

**AN APPROPRIATE ORDER WILL ENTER.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**